## Melnick's Case.

*Henry S. Drinker, Jr.*, for Board of Censors.
*William A. Glasgow*, for respondent.

STERN, P. J., Jan. 29, 1929.—The petition of the Committee of Censors, upon which a rule was granted on the respondent to show cause why he should not be disciplined, sets forth alleged improper professional conduct on the part of the respondent in four cases in which he represented the respective plaintiffs.

In these cases, the court, upon consideration of the testimony taken at the hearing before the court and also that taken before the Committee of Censors, finds the facts to be as follows:

1. The case of James Mason.

This party suffered an accident, and a verdict was recovered in his favor in the amount of $1700. The respondent, as his attorney, was paid by the Indemnity Insurance Company of North America, on or about Oct. 25, 1926, the sum of $1746.80, representing the amount of the verdict and costs. On Nov. 5, 1926, the respondent had a settlement with his client in which he made out a check to Mason for $800, and had him endorse it in blank and

return it to him, Mason apparently not noticing the amount of the check, and then he paid to Mason $375. After the Committee of Censors had started an investigation of this case, the respondent, on Sept. 8, 1928, made an additional payment to Mason of $205, and on Oct. 18, 1928, an additional payment of $220.

The respondent's defense in this matter was that he was entitled to a fee of $850 and that various outlays and expenses brought down the amount due to his client to $633. (Included in the claim of outlays was an item of $40 to George Phillips, an employee of the respondent, and another item of $40 to David Melnick, a brother of the respondent, these being payments alleged to be for investigation of the case and "trial assistance.") The respondent claims, somewhat inconsistently with this assertion of a less amount being due to Mason, that the original check of $800 was intended by him to be in the nature of a receipt. He states that the reason why he originally paid his client only $375 was because Mason told him that he was going south and asked him to hold the balance for him and meanwhile to look after some of his business affairs, and the respondent asserts that the delay in the ultimate settlement was due to the fact that he was unable to locate Mason.

The court finds that the two alleged expenditures of $40 each, above referred to, were unjustified charges. The court further finds as a fact that the respondent could at all times have located his client, that the latter did not request the respondent to hold any part of the money for him, that Mason was not informed by the respondent as to the amount actually due to him, that the respondent originally had no intention of paying the balance due (whether $258, as now claimed by the respondent, or $425, as subsequently actually paid by him), and that the balance was paid two years later only because of the starting of the investigation by the Committee of Censors.

These conclusions of the court are strengthened by a consideration of the methods which the respondent saw fit, and evidently thought it necessary, to employ in order to convince the Committee that he had made a proper settlement with his client. At the hearing before the Committee, the respondent produced a private memorandum book, which purported to show in itemized detail a number of payments made by him to Mason of $15 a week, beginning May 26, 1926, continuing until Nov. 1, 1926, and aggregating $360, as well as other alleged payments made in the case to doctors, to Phillips and for witness fees. The respondent testified before the Committee that the entries in this book had been made by him at or about the times therein indicated, and that he had actually made the payments to Mason as thus recorded. As a matter of fact, and as he afterwards expressly admitted both to the Committee and in open hearing before the court, the entries in this book were false and fictitious, having been made by him on the very day he appeared before the Committee, and no such payments had in fact been made. The respondent further admitted that he had tried to induce his client to testify before the Committee that the respondent had made the payments to him as set forth in the memorandum book.

2. The case of Stanley Skladzen.

This party suffered an accident on May 19, 1926, and, as a result, had a claim against the West Jersey Sand and Supply Company. There were claims of two other persons arising out of the same accident, and the respondent, representing all three claimants, made a "group settlement" in the sum of $2000. He then made individual settlements out of this amount with his three clients. As far as Skladzen was concerned, the respondent made out a check to him, dated Jan. 12, 1927, for $375, and had his client endorse it in

blank and return it to him, the client apparently not noticing the amount of the check. The respondent then gave Skladzen $275 in cash and $25 for the doctor's bill. The release given in the Skladzen case to the insurance company which paid the $2000 called for $800. After the Committee of Censors had started its investigation into the conduct of accident litigation in Philadelphia, an employee of the respondent brought to Skladzen another $100, asking him to say that in 1926 he had received small payments of $10, $15 and $20 a week, amounting in the aggregate to $100.

The respondent's version of the settlement with Skladzen was to the effect that out of the $2000 received in the group settlement, he had paid to each of the other two claimants $300, to a physician in the case $105, for costs of the suits $19.65, and that his own fee was $1000, leaving a balance of $275 for Skladzen, who, therefore, received, according to this calculation, all to which he was entitled. One's confidence in this position, however, is weakened not only by the fact that the respondent had procured Skladzen to endorse a check for $375 in blank and return it to the respondent but by the more significant and sinister circumstance that in this, as in the Mason case, the respondent produced before the Committee of Censors his private memorandum book purporting to show various small payments made to Skladzen during the period from May 23 to Dec. 24, 1926, aggregating about $100, and he testified that he had advanced these amounts to his client and that is why he gave to him only $275 in cash instead of the $375 called for by the check. Later, however, the respondent admitted that the entries in the memorandum book were false and made by him for the purpose of deceiving the Committee. The respondent further admitted that he had told Skladzen to go before the Committee and testify to the alleged instalment payments in corroboration of the respondent's testimony and of the entries in the memorandum book. As a matter of fact, Skladzen did so testify, but afterwards in open court admitted the truth.

3. The case of Charles Potts.

This person was in an accident on June 4, 1927. The respondent procured a settlement of the case for $150, but Potts claims that the respondent reported the settlement to him as $100 and paid him $40, representing half of the alleged amount recovered, less $5 costs and $5 to cover one-half of the doctor's bill. The respondent's defense is that while the settlement was for $150, he told Potts that the outlays had been such that they would have to divide on the basis of $100, to which Potts agreed. The respondent also claimed that he had given a check of $15 to George Phillips, an employee in his office, and that Phillips stated that he had cashed this check and turned over the proceeds to Potts's wife.

While there is some question as to whether Mrs. Potts received the $15, and while the contention of the respondent that he paid $55 to his client is not exactly consistent with his position that there was to be a division on the basis of a recovery of $100 (especially as he calculates his own net fee in the case as $63.95), nevertheless the amounts involved are so comparatively trifling and the exact circumstances so subject to doubt that this case is disregarded by the court in the present proceedings.

4. The case of Nicholas Buccieri.

In this matter, the infant son of one Mary Buccieri had an accident. According to her testimony, the respondent told her that the case had been settled for $100 and gave her $50, he agreeing to pay, in addition, the doctor's bill of $18. The respondent's version is that he had made a "group settlement" of four cases, including this one (the cases being entirely unrelated to

one another), for $475; that he had paid to the other claimants $135, $5 to one of the doctors, $18 to the doctor for the Buccieri boy, as above stated, $25 to a person who had brought in one of the cases to him and had investigated it, $15 to another person who had brought in and investigated the Buccieri case, and $24.20 for costs, a total of $222.20. He contended that Mrs. Buccieri had signified her willingness to accept $50 and that he, therefore, paid her that amount, leaving the sum of $202.80 remaining as his fee in the entire transaction. In a group settlement of this kind it is practically impossible to determine the proper amount to which each claimant is entitled, and while the two payments of $25 and $15 to the persons who brought the cases to the respondent and who, he says, investigated them for him, are clearly open to criticism as charges made against the clients, nevertheless the court disregards this case in the present proceedings.

Taking into consideration, therefore, only the Mason and Skladzen cases, it appears from the facts, as found by the court, that the respondent withheld from these clients moneys of which he was to all intents and purposes a trustee, that he made restitution only after the expiration of from one and one-half to two years and after the Committee of Censors had started its investigation into the conditions of accident litigation in Philadelphia, that in the proceedings before the Committee he made fictitious entries in his books, testified falsely and suborned his clients to give similar false testimony under oath. The only excuse that he offers in regard to these latter actions is that he was "greatly perturbed, confused and frightened." Confusion and fright, especially when, as claimed by the respondent, they did not arise from any misdeeds or consciousness of wrongdoing on his part, are certainly not justification for his conduct in the proceedings before the Committee. On the whole record, no court, however disposed to leniency, could make any but one order.

The writer avails himself of this opportunity to express disapproval of so-called "group settlements." In its report to the Law Association of Philadelphia, the Committee, while 'pointing out some of the dangers and weaknesses of the system, expresses the opinion that "the manifest advantages of such practice to all concerned more than outweigh its disadvantages. Such settlements should, it is, therefore, believed, be encouraged. . . ." Of course, the Committee gave to this subject considerable study, and opinions in regard to the matter may fairly differ, but probably no better illustration of the likely and almost inevitable abuses of the system of group settlements can be found than is disclosed by a reading of the testimony in the present case. It is unnecessary to discuss the subject at length, because that is done by the Committee in its report, but it may not be amiss to point out and to stress one fundamental vice which is inherent in group settlements, and that is, that instead of a plaintiff's battle being confined to the person who should be his sole opponent, namely, the defendant, he is forced by a group settlement into struggle and competition with all the other plaintiffs represented by his attorney and participating in the settlement. When a lawyer represents a client's claim, it is his duty to handle that claim on its own merits, entirely free of, and unimpaired by, any clash with the unrelated claims of other clients in his office; and for a lawyer by a group settlement to subject a client to such a conflict and to put himself into a position of temptation in the way of discrimination between various clients—bowing to the obstinate and determined and overriding the weak and inarticulate—is to establish a situation that, in the opinion of the writer, is inimical to the best traditions and standards of the relationship between lawyer and client.

In regard to the present respondent, the court enters the following order:

The rule of the Committee of Censors is made absolute and the prothonotary is directed to strike from the roll of attorneys of the Courts of Common Pleas of Philadelphia County the name of Samuel Melnick, the respondent, and to give notice of this action to the Orphans' Court of Philadelphia County and to the Supreme and Superior Courts of Pennsylvania.